**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| LEO SHUMACHER, Derivatively on Behalf of Nominal Defendant TWIST BIOSCIENCE CORPORATION, )))) | |
| Plaintiff, ) | Case No. _____ |
| v. )) | JURY TRIAL DEMANDED |
| EMILY LEPROUST, ROBERT CHESS, NELSON C. CHAN, KEITH CRANDELL, JAN JOHANNESSEN, XIAOYING MAI, ROBERT RAGUSA, MELISSA STAROVASNIK, WILLIAM BANYAI, and JAMES THORBURN, ))))))))) | |
| Defendants, )) | |
| and )) | |
| TWIST BIOSCIENCE CORPORATION, )) | |
| Nominal Defendant. ) | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Leo Shumacher ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Twist Bioscience Corporation ("Twist" or the "Company"), against its certain current and former executive officers and members of the Company's Board of Directors (the "Board") for breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and violations of Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference

1

call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Twist, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Twist against certain current and former officers and members of the Company's Board (collectively, the "Individual Defendants") (defined below) for, among other things, breaching their fiduciary duties to the Company and its stockholders by intentionally or recklessly making or permitting the dissemination of materially false and misleading statements and omissions between December 13, 2019 through November 14, 2022 (the "Relevant Period") regarding the Company's business, operations, and finances.

2.      Twist is a biotechnology company incorporated in Delaware with its principal executive offices in South San Francisco, California, that manufactures synthetic DNA and DNA products. Synthetic DNA products allow users to design and modify DNA for the purposes of, among other things, academic research, enhancing specialty chemical production, and developing healthcare treatments. The Company's customers include diagnostic companies, hospitals, and research institutions.

3.      During the Relevant Period, the Company and its top executives repeatedly assured investors that Twist possessed innovative proprietary technology relating to its synthetic DNA products that positioned the Company for significant future growth. The Company further claimed that it had already achieved substantial growth during the Relevant Period, growing from a customer base of approximately 1,300 diagnostic companies, hospitals, research institutions, and

2

others at the end of fiscal year 2019, to approximately 2,900 customers at the end of fiscal year 2021. The Company also reported massive growth in its gross margins, purportedly growing from 12.8% in fiscal year 2019, to 39.1% in fiscal year 2021, and projected to reach 40% for fiscal year 2022.

4.      Further, on December 22, 2020, the Company announced plans to build a new facility in Wilsonville, Oregon dubbed the "Factory of the Future," (the "Oregon Facility"), which would purportedly provide hundreds of jobs and occupy 110,000 square feet. By August 2022, the Company projected annual capital expenditures between $95 million and $100 million, largely attributable to "building out" the new facility.

5.      The truth concerning the Company's actual financial health began to emerge on November 15, 2022, when Scorpion Capital ("Scorpion") published a detailed report (the "Scorpion Report") alleging that Twist is "a cash-burning inferno that is not a going concern." Scorpion alleged that, among other things, Twist's purported DNA chip technology is a "farce" and that the Company's growth and revenues are unsustainable. In fact, former employees who provided information to Scorpion contradicted the Company's claims that Twist's technology is revolutionary, explaining instead that the Company's manufacturing workflow uses "pretty standard molecular biology technique[s]" and is "at the same point that all of the other vendors are at."

6.      Scorpion further alleged that the Company's growth is dependent upon unsustainable pricing strategies, such as using below-cost prices to undercut competitors by as much as 70% to 85%, and concluded that Twist is "operating a Ponzi-like scheme that will end in bankruptcy."

7.      As to the Oregon Facility, the Scorpion Report alleged that Twist is perpetuating

fraud through false reporting of capital expenditures and gross margins which, according to Scorpion, are actually negative. Scorpion's investigation of the Oregon Facility revealed no evidence that Twist is preparing to begin manufacturing there, suggesting that the Company is using the facility to hide large operating expenses as fraudulent capital expenditures.

8.      Following the release of the Scorpion Report, the price of Twist common stock fell $7.57 per share, or nearly 20%, from a close of $38.00 per share on November 14, 2022, to close at $30.43 per share on November 15, 2022. The price of the Company's stock has never recovered, closing at $19.68 per share on September 21, 2023.

9.      As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and misleading statements and omissions of material fact to the investing public. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times. Specifically, throughout the Relevant Period, Twist and its top executives made materially false and misleading statements, as well as failed to disclose material adverse facts, about the true nature of the Company's business, operations, and finances. Specifically, Twist overstated the commercial viability of Twist's synthetic DNA manufacturing technology while engaging in accounting fraud and using unsustainable pricing to inflate the Company's true financial condition and prospects.

10.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

11.     As a result of the foregoing, a securities fraud class action was filed against the Company, Chief Executive Officer ("CEO") and director Emily Leproust ("Leproust"), and Chief Financial Officer ("CFO") James Thorburn ("Thorburn"), captioned *Peters v. Twist Bioscience*

*Corporation et al,* Case No. 5:22-cv-08168-EJD (N.D. Cal.) (the "Securities Action"). The Securities Action has exposed the Company to massive class-wide liability.

12.     In light of the Individual Defendant's misconduct—which has subjected the Company to the Securities Action, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend millions of dollars.

13.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Twist's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of sections 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant

to 28 U.S.C. § 1367(a).

16.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Nominal Defendant Twist is incorporated in this District and conducts business in this District.

## PARTIES

*Plaintiff*

19.     Plaintiff is and, since January 2019, has been a continuous shareholder of Twist common stock.

*Nominal Defendant*

20.     Nominal Defendant Twist is incorporated under the laws of Delaware with its principal executive offices located in South San Francisco, California. Twist's common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "TWST."

*Individual Defendants*

21.     Defendant Leproust is a co-founder of the Company and has served as CEO and a member of the Board since April 2013, and as Chair of the Board since October 2018. As set forth in the proxy statement filed by Twist with the SEC on January 6, 2023 ("the 2023 Proxy"), Leproust received $5,917,663 in compensation from the Company in 2022. Defendant Leproust is named as a defendant in the Securities Action.

22.     Defendant Robert Chess ("Chess") has served as a member of the Board since July

6

2014 and as lead independent director since October 2018. Defendant Chess also serves as Chair of the Board's Nominating and Corporate Governance Committee and as a member of the Compensation Committee. As set forth in the 2023 Proxy, Chess received $296,945 in compensation from the Company in 2022.

23.     Defendant Nelson C. Chan ("Chan") has served as a member of the Board since May 2019. Defendant Chan also serves as a member of the Board's Nominating and Corporate Governance Committee and Audit Committee. As set forth in the 2023 Proxy, Chan received $273,406 in compensation from the Company in 2022.

24.     Defendant Keith Crandell ("Crandell") has served as a member of the Board since October 2013. Defendant Crandell also serves as a member of the Board's Nominating and Corporate Governance Committee and Compensation Committee. As set forth in the 2023 Proxy, Crandell received $270,174 in compensation from the Company in 2022.

25.     Defendant Jan Johannessen ("Johannessen") has served as a member of the Board since October 2018. Defendant Johannessen also serves as Chair of the Board's Audit Committee and as a member of the Nominating and Corporate Governance Committee. As set forth in the 2023 Proxy, Johannessen received $283,205 in compensation from the Company in 2022.

26.     Defendant Xiaoying Mai ("Mai") has served as a member of the Board since July 2018. Defendant Mai also serves as a member of the Board's Audit Committee. As set forth in the 2023 Proxy, Mai received $1,822,438 in compensation from the Company in 2022.

27.     Defendant Robert Ragusa ("Ragusa") has served as a member of the Board since November 2016. Defendant Ragusa also serves as a member of the Board's Audit Committee and the Compensation Committee. As set forth in the 2023 Proxy, Ragusa received $260,872 in compensation from the Company in 2022.

28.     Defendant Melissa Starovasnik ("Starovasnik") has served as a member of the Board since August 2021. Defendant Starovasnik also serves as Chair of the Board's Compensation Committee. As set forth in the 2023 Proxy, Starovasnik received $267,409 in compensation from the Company in 2022.

29.     Defendant William Banyai ("Banyai") is a co-founder of the Company and has served as a member of the Board since April 2013. Defendant Banyai has served as the Company's Senior Vice President of Advanced Development and General Manager of Data Storage since January 2020, and previously served as Chief Operating Officer from April 2013 to December 2019. As set forth in the 2023 Proxy, Banyai received $2,634,318 in compensation from the Company in 2022.

30.     Defendant Thorburn has served as the Company's CFO since April 2018. As set forth in the 2023 Proxy, Thorburn received $2,705,683 in compensation from the Company in 2022. Defendant Thorburn is named as a defendant in the Securities Action.

31.     Defendants referenced in paragraphs 21 through 30 are herein referred to as the "Individual Defendants."

32.     The Individual Defendants, together with Twist, are herein referred to as "Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

33.     By reason of their positions as officers and/or directors of Twist, and because of their ability to control the business and corporate affairs of Twist, the Individual Defendants owed Twist and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Twist in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the

8

best interests of Twist and its shareholders so as to benefit all shareholders equally.

34.     Each director and officer of the Company owes to Twist and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

35.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Twist, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

36.     To discharge their duties, the officers and directors of Twist were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

37.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Twist, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

38.     As senior executive officer and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition,

performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

39.     To discharge their duties, the officers and directors of Twist were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.   By virtue of such duties, the officers and directors of Twist were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Twist's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Twist conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Twist and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Twist's operations would comply with all applicable laws and Twist's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

40.      Each of the Individual Defendants further owed to Twist and the shareholders the duty of loyalty requiring that each favor Twist's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

41.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Twist and were at all times acting within the course and scope of such agency.

42.      Because of their advisory, executive, managerial, and directorial positions with Twist, each of the Individual Defendants had access to adverse, non-public information about the Company.

43.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein,

as well as the contents of the various public statements issued by Twist.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

44.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

45.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

46.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

47.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Twist, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

48.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her

overall contribution to and furtherance of the wrongdoing.

49.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Defendants and of Twist and at all times acted within the course and scope of such agency.

## TWIST'S CODE OF CONDUCT

50.     Twist's Code of Conduct, titled "Standards of Business Conduct," applies to all directors, employees, and contractors of the Company.

51.     In a section titled, "Company Records and Communications; Quality of Disclosures," the Code of Conduct provides:

> Twist Workers must strive to ensure that all information transmitted, both within and outside the Company, is honest and well-founded; misrepresentation of information to create a misleading business picture is not permitted. Twist Workers must never withhold or fail to communicate information that should be brought to the attention of any level of management, or intentionally falsify records, including digital copies and computer records. All Company accounts, financial reports, research reports, marketing information, sales reports, competitive bids, requests for proposals, tax returns, expense accounts, time sheets, claims and any other Company documents, including those submitted to governmental agencies, must be accurate. All entries on the Company's books and records must represent, and not conceal, the true nature of each transaction.

> Company reports and documents filed or submitted to any governmental authority (including, if applicable, the Securities and Exchange Commission, the Food and Drug Administration and the Internal Revenue Service) and any public communications shall include full, fair, accurate, timely and understandable disclosure.

52.     In a section titled, "Public Company Reporting," the Code of Conduct states:

> As a public company, it is of critical importance that the Company's filings with the Securities and Exchange Commission and other public agencies and bodies be full, fair, accurate, timely and understandable. Depending on their respective positions with the Company, employees, officers or directors may be called upon to provide information necessary to assure that the Company's public reports meet these requirements. The Company expects employees, officers and directors to take this responsibility very seriously and to provide prompt and accurate answers to inquiries related to the Company's public disclosure requirements.

13

53.     With respect to fair dealing, the Code of Conduct states:

Each Twist Worker should endeavor to deal fairly with customers, business partners, competitors, the public and one another at all times and in accordance with ethical business practices. No one should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practice.

## TWIST'S AUDIT COMMITTEE CHARTER

54.     Twist's Audit Committee Charter states that the purpose of the Audit Committee is to:

[O]versee the accounting and financial reporting processes of the Company and audits of its financial statements, the effectiveness of the Company's internal control over financial reporting and to make such reports as may be required of an audit committee under the rules and regulations promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), including without limitation the Audit Committee report to stockholders for inclusion in the Company's annual proxy statement. The Committee is not responsible, however, for planning or conducting audits, or determining whether the Company's financial statements are complete and accurate or in accordance with generally accepted accounting principles.  The Committee also reviews and assesses the Company's processes to manage and control risk, except for risks assigned to other committees of the Board or retained by the Board.

55.     In a section outlining the Audit Committee's authority and responsibilities with respect to Risk Management, the Audit Committee Charter states that the Audit Committee shall, among other things:

Review and discuss with management, on a periodic basis, the Company's practices with respect to risk identification, assessment, monitoring and risk management and mitigation, with an emphasis on significant business risks of the Company, including financial, privacy, operational, compliance, physical security, legal and other key business risks, except as to those risks for which oversight has been assigned to other committees of the Board or retained by the Board.

Discuss with the independent auditor the Company's risk assessment and risk management guidelines, policies and processes.

56.     With respect to financial reporting and internal controls, the Audit Committee Charter charges the Audit committee with the responsibility to, among other things:

Oversee the integrity of the Company's financial statements and monitor the Company's accounting practices and reporting.

\*                    \*                    \*

Meet with management and the independent auditor to discuss the annual financial statements, including Management's Discussion and Analysis of Financial Condition and Results of Operations contained therein, and the report of the independent auditor with respect to such annual financial statements and to discuss significant issues encountered in the course of the audit work, including: restrictions on the scope of activities; access to required information; the adequacy of internal controls, including any special steps adopted in light of any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting identified during the course of the annual audit, and the adequacy of disclosures about changes in internal control over financial reporting; the adequacy of the disclosure of off-balance sheet transactions, arrangements, obligations and relationships in reports filed with the SEC; and the appropriateness of the presentation of any non-GAAP financial measures (as defined in the Regulations) included in any report filed with the SEC or in any public disclosure or release.

Review and discuss with management and the independent auditor, if any, management's report on internal control over financial reporting, and any independent auditor's audit of the effectiveness of the Company's internal control over financial reporting and its attestation report, prior to the filing of the Company's annual report on Form 10-K (the "Form 10K") with the SEC.

Following such review and discussions, if so determined by the Committee, recommend to the Board that the annual financial statements be included in the Company's annual report on Form 10-K.

Generally review and discuss the Company's earnings press releases, as well as any financial information and earnings guidance provided to analysts and rating agencies.

Discuss with management and the independent auditor the quarterly financial statements prior to the filing of each of the Company's quarterly reports on Form 10-Q, including Management's Discussion and Analysis of Financial Condition and Results of Operations contained therein.

57.    Furthermore, the Audit Committee Charter charges the Audit Committee with the

authority and responsibility to periodically conduct separate executive sessions with management,

the internal auditor, and the independent auditor "to discuss matters that any of them or the

Committee believes could significantly affect the financial statements and should be discussed privately; and review with the independent auditor any audit problems or difficulties and management's response."

## SUBSTANTIVE ALLEGATIONS

### Background

58.    Twist purports to have developed a "disruptive DNA synthesis platform" to industrialize the engineering of biology to provide DNA a wide range of uses and markets. The Company claims that its core technology has pioneered a new method of manufacturing synthetic DNA applicable to a broad range of synthetic DNA-based products including synthetic genes, tools for next generation sequencing, sample preparation, and antibody libraries for drug discovery and development.

### Materially False and Misleading Statements

59.    On December 13, 2019, the Company filed its annual report for the fiscal year ending September 30, 2019, on Form 10-K (the "2019 10-K") with the SEC. The 2019 10-K was signed by Defendants Leproust, Banyai, Chan, Chess, Crandell, Johannessen, Mai, Ragusa, and Thorburn. Defendants Leproust and Thorburn further provided certification that they had reviewed the 2019 10-K, that it "[did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and that they were "responsible for establishing and maintaining disclosure controls and procedures."

60.    In the 2019 10-K, the Individual Defendants touted the Company's synthetic DNA technology, claiming:

> We have combined our silicon-based DNA writing technology with proprietary software, scalable commercial infrastructure and an ecommerce platform to create

16

an integrated technology platform that enables us to achieve high levels of quality, precision, automation, and manufacturing throughput at a significantly lower cost than our competitors.

We have applied our unique technology to manufacture a broad range of synthetic DNA-based products, including synthetic genes, tools for next generation sample preparation, and antibody libraries for drug discovery and development, all designed to enable our customers to conduct research more efficiently and effectively.

61.     The 2019 10-K further claimed that the Company was selling its synthetic DNA products to "a global customer base of 1,305 customers across a broad range of industries."

62.     The 2019 10-K further assured investors that the Company had significant growth potential and DNA synthesis methods that were vastly superior to its competitors, explaining that Twist's "silicon-based chip technology can increase DNA production by a factor of 9,600 on a footprint like that of traditional DNA synthesis methods" and "significantly lowers the volume of required reagents."

63.     On November 27, 2020, the Company filed its annual report for fiscal year 2020 on Form 10-K (the "2020 10-K") with the SEC. Defendants Leproust, Banyai, Chan, Chess, Crandell, Johannessen, Mai, Ragusa, and Thorburn signed the 2020 10-K, while Defendants Leproust and Thorburn also provided signed certification that the report "[did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and that they were "responsible for establishing and maintaining disclosure controls and procedures."

64.     As in the 2019 10-K, the 2020 10-K represented that Twist's "proprietary technology" is enabling a wide range of customers "to conduct research more efficiently and effectively," and stated that the Company's customer base had grown to approximately 2,200

customers.

65.     The 2020 10-K also reported a massive increase in gross margins, from 12.8% in fiscal 2019 to 31.8% for fiscal year 2020.

66.     On December 22, 2020, the Company issued a press release announcing that it planned to build a "Factory of the Future" in Wilsonville, Oregon. The press release claimed that the Oregon Facility would cover 110,000 square feet, provide up to 400 jobs, and become operational in calendar year 2022.

67.     Twist reported substantial expected capital expenditures throughout the Relevant Period, and largely attributed these expenditures to building the Oregon Facility. On February 4, 2021, for instance, the Company issued a press release announcing its earnings for the first quarter of fiscal year 2021 and projecting that capital expenditures for fiscal year 2021 would be $30 million, "including expansion into 'Factory of the Future.'"

68.     The Company also reiterated the purported superiority of its proprietary technology and increasing margins. On November 23, 2021, the Company filed its annual report for fiscal year 2021 on Form 10-K (the "2021 10-K") with the SEC. Each of the Individual Defendants signed the 2021 10-K, while Defendants Leproust and Thorburn also provided signed certification that the report "[did] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and that they were "responsible for establishing and maintaining disclosure controls and procedures."

69.     The 2021 10-K claimed that Twist's "proprietary technology" would enable customers "to conduct research more efficiently and effectively," and reported that the Company had approximately 2,900 global customers.

70.    The 2021 10-K also reported a substantial increase in the Company's gross margins, reporting 39.1% gross margins for fiscal year 2021, up from 31.8% in the prior fiscal year.

71.    On August 5, 2022, the Company issued a press release announcing its financial results for the third fiscal quarter of 2022. The press release provided increased guidance for the Company's annual capital expenditures to a range between $95 million and $100 million, attributed to the "buildout" of the Oregon Facility. Additionally, the press release assured investors that the Company's annual gross margins would reach 40% in fiscal year 2022.

72.    Also on August 5, 2022, the Company hosted a quarterly earnings call with analysts and investors, during which Defendant Leproust assured investors that the Oregon Facility would begin generating revenue in January 2023.

73.    On August 16, 2022, Defendant Leproust told the *Portland Business Journal* that the Oregon Facility would be fully operational by January 2023 and stated that the Company was "in a very aggressive hiring spree in Wilsonville," where the Oregon Facility is located. Defendant Leproust further represented that renovations at the Oregon Facility were complete, the facility's manufacturing equipment was in place, and "[o]nce we have [completed quality checks], we'll be able to start taking orders and ship product."

74.    The statements detailed above were materially false and misleading and omitted material adverse facts regarding the Company's business and operations. Specifically, the statements overstated the commercial viability of Twist's synthetic DNA manufacturing technology while engaging in accounting fraud and using unsustainable pricing to inflate the Company's true financial condition and prospects.

**The Truth Emerges**

75.    The truth began to emerge on November 15, 2022, when Scorpion published the

Scorpion Report, alleging that Twist is "a cash-burning inferno that is not a going concern." Specifically, Scorpion alleged that, among other things, Twist's purported DNA chip technology is a "farce," comparable to now infamous non-existent blood-testing technology developed by Theranos Inc. The Scorpion Report further alleged that the Company's growth and revenues are unsustainable, among other issues.

76.     According to the Scorpion Report, "Twist's 'DNA chip' is simply a cut-and-paste of an old technology" that Defendant Leproust's former employer, Agilent Technologies, developed in the early 2000s and had proven an "epic flop." The Scorpion Report further alleged that Twist's DNA chip is "nothing more than a DNA micro-array, a legacy 40-year old technology" that is a commodity already offered by competitors rather than an actual, innovative microchip with transistors.

77.     The Scorpion Report compared Twist to the now-defunct Theranos Inc., which infamously claimed that it had developed a revolutionary blood-testing technology, but in reality was still using traditional technology.

78.     The Scorpion Report also revealed that, according to certain former Twist employees, representations about the Company's competitive advantages, including the purported ability of its DNA chip technology to manufacture DNA at dramatically higher volumes and with less raw materials, are patently false. Scorpion quoted former Twist employees who contradicted the Company's claims that Twist possesses revolutionary technology. These former employees explained that the Company's manufacturing workflow uses "pretty standard molecular biology technique[s]" and is "at the same point that all of the other vendors are at."

79.     Furthermore, the Scorpion Report characterized Twist as a "ticking time bomb" that is "operating an unsustainable Ponzi-like scheme based on price dumping and customer

subsidies to buy revenue and create the illusion of 'growth.'" The Scorpion Report explained that Twist's strategy was to "radically underprice the competition in an effort to purchase market share and 'growth,'" and reported that Twist undercut competitors' pricing by as much as 85%.

80.    According to the Scorpion Report, Twist depends on "extreme discounting to hold on to [customer] accounts," and several customers told Scorpion that they would not continue to purchase from Twist if not for the massive discounts they are receiving. In fact, Scorpion reported that certain of Twist's competitors internally label the Company's strategy a "Ponzi scheme," given that Twist is only displaying growth by raising money from investors to sell products at a loss to its customers.

81.    Given that Twist's price dumping dramatically reduced prices throughout the industry, certain former Twist employees told Scorpion that they do not expect Twist to ever recover from the unsustainably low prices they caused, stating that "once you displace pricing and that badly, it's almost impossible to lift it again."

82.    The Scorpion Report alleged that Twist's reported gross margins—nearly 40% as of fiscal year 2021—are "unusually high" for a commodity manufacturer, and that Twist's gross margins are actually negative, given the Company's concealment of its unremarkable technology and unsustainable pricing strategies. The Scorpion Report alleged that the reported gross margins were fraudulent, and that the Company improperly classified certain costs as operating expenses and capital expenses. As explained in the Scorpion Report, Twist conceals these problems in two ways: (1) "improperly expensing direct manufacturing costs like labor as [research and development], an operating expense"; and (2) "capitalizing manufacturing costs as capital expenditures."

83.    Moreover, Scorpion highlighted the fact that Twist has largely attributed its

skyrocketing capital expenditures to development of the Oregon Facility, which it characterized as an "epic hoax . . . that . . . is little more than a ruse to conceal an additional $100MM of losses by misclassifying [cost of goods sold] as capital expenditures." Scorpion reported that its own private investigator had visited the location of the Oregon Facility, where he found "a deserted parking lot, a quiet loading dock," no reception area, a handful of office employees working at computers, and no evidence of manufacturing equipment or activity.

84.     The Scorpion Report also identified several additional "red flags" that Twist is concealing fraudulent behavior, including a "cesspool of bad actors" comprising the Company's largest holders at the time of the its October 2018 Initial Public Offering, potential undisclosed related-party transactions by Defendant Thorburn, and suspicious transactions between Twist and offshore Chinese entities raising concerns that the Company is violating the Foreign Corrupt Practices Act.

85.     In response to the news from the Scorpion Report, the price of Twist common stock declined $7.57 per share, or nearly 20%, from a close of $38.00 per share on November 14, 2022, to close at $30.43 per share on November 15, 2022.

### Harm to the Company

86.     As a direct and proximate result of the Individual Defendants' misconduct, Twist has lost and expended, and will lose and expend, millions of dollars.

87.     Such expenditures include, but are not limited to legal fees associated with the Securities Action filed against the Company and its CEO and CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

88.     Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the material weaknesses in the Company's internal control over financial

reporting.

89.     Such losses also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

90.     As a direct and proximate result of the Individual Defendants' conduct, Twist has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

91.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

92.     Twist is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

93.     Plaintiff is an owner of Twist common stock and has been a continuous shareholder of Company stock at all relevant times.

94.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

95.     A pre-suit demand on the Board of Twist is futile and, therefore, excused. At the time this action was commenced, the nine-member Board consisted of Individual Defendants Leproust, Chess, Chan, Crandell, Johannessen, Mai, Ragusa, Starovasnik, and Banyai (the

"Director Defendants"). As set forth below, all nine Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

96.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

97.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

98.    Each of the Director Defendants authorized and/or permitted false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

99.    Director Defendants Leproust, Banyai, Chan, Chess, Crandell, Johannessen, Mai, and Ragusa signed the 2019 10-K and 2020 10-K, while all nine of the Director Defendants signed the 2021 10-K.

100.    Additionally, the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

101.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

102.    Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

103.    Defendants Johannessen, Chan, Mai, and Ragusa (the "Audit Defendants") serve on the Company's Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

104.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the

Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

105.    In addition, Director Defendant Leproust has been named as a defendant in the Securities Action and, therefore, faces a substantial likelihood of liability for issuing and/or authorizing the issuance of the same materially false and misleading statements at issue in this action. Defendant Leproust, therefore, cannot exercise independent business judgment regarding allegations that arise from the same misconduct alleged here and in the Securities Action. Thus, any demand upon Defendant Leproust would be futile.

106.    Moreover, the Director Defendants have taken no remedial action to redress the conduct alleged herein.

## COUNT I

### Against The Individual Defendants For Violations of § 10(b)
### of the Exchange Act and Rule 10b-5

107.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108.    The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

109.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

110.    The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of

material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

111.    The Individual Defendants acted with scienter because they (i) knew that the public documents and statements issued or disseminated in the name of Twist were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

112.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Twist, their control over, and/or receipt and/or modification of Twist's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Twist, participated in the fraudulent scheme alleged herein.

113.    As a result of the foregoing, the market price of Twist common stock was artificially inflated. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of Twist common stock in purchasing Twist common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

114.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm.  The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company

to millions of dollars in potential class-wide damages in the Securities Action.

## COUNT II

### Against The Individual Defendants
### For Breach Of Fiduciary Duty

115.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116.    The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, candor, loyalty, and due care.

117.    The Individual Defendants willfully ignored the obvious deficiencies in the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

118.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

119.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

120.    As a result of the misconduct alleged herein, the Individual Defendants are liable

to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

121.    Plaintiff, on behalf of Twist, has no adequate remedy at law.

## COUNT III

### Against The Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

122.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

123.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

124.    Plaintiff on behalf of Twist has no adequate remedy at law.

## COUNT IV

### Against The Individual Defendants for Unjust Enrichment

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    By their wrongful acts, violations of law, and false and misleading statements and

omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Twist.

127.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Twist that was tied to the performance or artificially inflated valuation of Twist or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

128.    Plaintiff, as a shareholder and a representative of Twist, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

129.    Plaintiff on behalf of Twist has no adequate remedy at law.

## COUNT V

### Against The Individual Defendants For Waste Of Corporate Assets

130.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

131.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of the Company's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

132.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying and collecting excessive compensation and bonuses; and (b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending

the Company and its officers against the Securities Action.

133.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

134.    Plaintiff on behalf Twist has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Twist and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C.    Directing Twist to take all necessary actions to reform and improve its corporate governance and internal procedures to protect Twist and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

- strengthening the Company's internal operational control functions;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.


Dated: September 25, 2023                 **RIGRODSKY LAW, P.A.**

                                    By:   */s/ Seth D. Rigrodsky*
                                          Seth D. Rigrodsky (#3147)
                                          Gina M. Serra (#5387)
                                          Herbert W. Mondros (#3308)
Of Counsel:                               300 Delaware Avenue, Suite 210
                                          Wilmington, DE 19801
**MORRIS KANDINOV LLP**                   Telephone: (302) 295-5310
Leonid Kandinov                           Facsimile: (302) 654-7530
550 West B Street, 4th Floor              Email: sdr@rl-legal.com
San Diego, CA 92101                       Email: gms@rl-legal.com
(877) 216-1552                            Email: hwm@rl-legal.com
leo@moka.law
                                          *Attorneys for Plaintiff*